Thank you, Your Honors. Good morning. My name is Earl Lees. I represent the Skokomish Indian Tribe, two of the successors to the Treaty of Point No Point. Under the Treaty of Point No Point, the Skokomish Reserve rights and privileges relating to hunting, gathering, and fishing. And today I stand before this panel asking for the opportunity to enforce Skokomish's constitutionally protected interests only against the Suquamish officers. Okay. Counsel, I've got a couple of really fundamental questions I'd like to get out of the way just to make sure that I understand. So are the lands that we're talking about here, are they public lands? The lands at issue are all owned either by the State of Washington or by the federal government, or are they in private hands as well? That goes to the definition of open, done, and claim. What we're looking at is to regulate principally those lands that are in public ownership or domain. There may be some private lands that we have access to, and that has not been adjudicated by a federal court as of yet. Okay. So most of these lands are public? Yes. Okay. The right that you're asserting is the right to hunt in these lands, and you want the same right that you have been given over fishing. Is that correct? Yes. Because you're arguing that U.S. v. Washington settles these questions. We believe that in U.S. v. Washington, the court laid out some fundamental principles. One, that the treaty is a reservation of rights. It is not a grant of rights, and this goes back even earlier to Winans. So in the drafting of the treaty, we reserve the right to go at a minimum to our ceded area, the lands that the Skokomish, the Twana, the Sklallam, and the Chemekum ceded to the United States. We also can go to that portion of that, which was our Skokomish or Twana territory, as described by George Gibbs in his 1854-55 journal. We think that those findings define the geographic boundaries of the minimum where we can go. And we think that's consistent with state law as well that recognizes the reservation of rights. And on the reservation of the lands that you seek to hunt on, are you claiming an exclusive right there? We are asking that we – Exclusive of any other tribe? No, we are only asking that – if I could explain the reservation of rights just a bit more, and then I'll address that. Okay. With respect to the reservation of rights, if we look to State v. Buchanan, which the U.S. Supreme Court denied a petition of certiorari for, they looked at the Treaty of Point Elliott, which the Skokomish members belong to, a separate treaty from ours. And they said, under the Point Elliott Treaty, of course they can go to their ceded area, the lands that they conveyed to the United States. And they can go to other lands that they either hunted on and – or actually, sorry – they actually hunted on and occupied over an extended period of time, principally around treaty times. And in this situation, we believe in U.S. v. Washington that the Court has clearly identified that we have separate ceded areas, the Suquamish have Point Elliott, the Skokomish and the Sklallams have the point-no-point area. What the Suquamish officers have done is they've opened our territory and our point-no-point ceded area, an area where they could not have reserved a right. It was never theirs to begin with. And we think that in U.S. v. Washington, it explains that a bit more. And there are specific findings in that case. For example, in Hood Canal, because they opened the west side of Hood Canal in the Olympics, far removed from the Point Elliott ceded area. The Court found in U.S. v. Washington that the Hood Canal drainage south of Port Gamble area, only the Skokomish and the Twana occupied it. Also, the Court found that the Suquamish did not occupy the territory described by Gibbs, which the Twana long occupied. And when you look at the treaty itself, the treaty of point-no-point that the Sklallam and we belong to, it specifically says the lands and country occupied by the Skokomish, Twana, Chemekum, and Sklallam. What we're asking the Court is to allow us to exclude the Suquamish members, in essence, by stopping the Suquamish officers who are engaged in unlawful conduct. And this is no different than a Fond du Lac band of Chippewa Indians or in Bay Mills. We're going to the regulation. We're saying that they cannot issue licenses, permits, or try to negotiate some backdoor deal to get into our area. Now, if this Court has concerns that we're attempting to assert some primary right over the Sklallams or the lower Elwha-Klallam, we would gladly amend our complaint to remove any distinction between a primary right, a secondary right, or an invitational right, and simply ask to enjoin the unlawful conduct of the Suquamish officers to keep them out. So you're effectively saying don't decide any of our rights vis-à-vis any other tribes, but just tell the Suquamish that they can't come onto this land. Yes. Is that effectively what you're asking? Yes, Your Honor. We feel that they have no basis. So in other words, you're going to amend your complaint and get rid of this primary right stuff? We'll get rid of all of that because obviously that is an issue where there are four signatories left to the Treaty of Point-on-Point. The Jamestown Sklallam, the Port Gamble Sklallam, the lower Elwha-Klallam, and Suquamish. Because that's of some worry to me because it seemed to me that what you wanted was the primary right and your declaratory relief, and the primary right meant not only a first right but the right to exclude anybody else. And we feel that if we had been given the opportunity to amend our complaint and in essence limit the scope in order to further mitigate any potential impacts to other tribes, that would have been the first action that we took. So as I understand it, the Suquamish and the Skokomish have different interpretations of what the reservation is. That your interpretation is there were discrete parcels of land that we ceded and therefore we have reserved rights in. And there were discrete parcels that the Suquamish hunted in and that they have reserved their rights in. And those are not the overlapping parcels. Am I correct that that's your basic theory? It is our basic theory. And if I understand the Suquamish theory, their theory is no, it's an undivided right in the whole. Their theory — Is that their basic theory? Do you understand it? We would interpret their theory as to be the flip. We believe that the treaty is a reservation of rights. We can go where we went at treaty time subject to those other conditions that we would have recognized vis-à-vis each other. The Suquamish are asserting, in essence, that it is a grant of rights. The U.S. granted them a privilege that unlike in fishing where you have the right to fish at usual and accustomed grounds and stations, the treaty provides the privilege to hunt on open and unclaimed lands. That could theoretically be statewide or nationwide. It could be the lands of the whole. Yes. It could be Orlando, Florida. And we feel that that is stepping beyond — And in this appeal, is that issue ripe for us to decide? As between those two competing theories of interpretation of the treaties? We feel, Suquamish, that that issue has long since been resolved. Since Winans and on, the treaties are a reservation. They allow you to go — Can you tell me, give me a paragraph, give me a page of a particular case where we have decided this vis-à-vis hunting grounds as opposed to fishing grounds? All I can say, Your Honor, is — Those are very different problems dealing with the taking of fish versus the taking of game. Again, the closest case that we have is a State of Washington case in which the U.S. Supreme Court declined to take cert. They analyzed it based on a Winans test where the treaties were a reservation of rights. And you could only go to your seat — You're dealing at a pretty high level of abstraction. So did that case deal with hunting rights? It did. It was specifically about a Point Elliot tribe's hunting within the Yakamas area, far to the east, removed from their territory. The Washington Supreme Court said specifically that — And to quote them, that the Point Elliot tribe, such as Suquamish, may open their area to hunting. Their territory ceded to the United States described in Article I of the Treaty of Point Elliot. Or areas that are proven to have been actually used for hunting and occupied by the tribe over an extended period of time. They went back and looked at Winans and the other reservation of rights. This is a Washington Supreme Court case? Yes. And it is 138 Washington 2nd, 186, and cert was denied, 528 U.S. — I mean, yes, they could hunt those grounds, but it didn't say that they could not hunt other places. Before you get too far down the road, I wanted to ask you whether when you asked to amend the complaint, when you asked Judge Layton, did you, in the motion, advise him that you wanted to proceed with deleting the claim of primary rights? We were not given an opportunity to submit a motion. The court denied the request and said that there was no factual basis to permit an amendment of the complaint because Rule 19 precluded that. And so we simply took an appeal. Okay, right. Well — Go ahead. Wasn't he really saying, based on the way you've pled it now, there's no way to replete it? Because really, what you were — I mean, I don't have any idea that the court had any idea in its head that you were going to give up your primary right theory. Nobody had suggested that in this record. We had argued, again, at the district court level, that this was a reservation of rights and that they couldn't come into our area because the area was never theirs to begin with. We did not specifically indicate to Judge Layton that we would seek to amend with respect to that. We felt that we could narrow the scope of this case or potentially, which we don't like to do, we noted with Judge Layton, create a case in controversy, theoretically, by revoking the S'Klallam's permission to have access to the area. Right now, we have an unwritten accord with them where they can access Skokomish or Twana territory to hunt. And that is not something we want to do. After considering the briefs by the parties, Skokomish believes that the most appropriate method would be to simply disregard the primary rights argument in this case, especially after amicus was granted for the S'Klallam's. But Judge Layton never had a chance to hear that. No, and we feel that if it were remanded back to him and he had the opportunity to consider that, that there may be a possibility that we could proceed forward. Again, under Chemoin, if a claim is patently frivolous, the district court does not need to necessarily find that person a necessary party. We feel that the reservation of rights doctrine is such a foundational principle, it's hornbook law, that they don't have a claim. And when you read it in context of what was argued in the State v. Buchanan, we should be allowed to at least keep them out. We can't understand how a tribe could suggest, if this afternoon my counsel is in session, cut a regulation to open up Idaho to hunting and within the Nez Perce territory, how would that be consistent with the concepts of reservation of rights under the treaty? It completely flies in the face of that. Counsel, are you able to make a representation as to what the S'Klallam regard as the appropriate legal theory of these treaties? I gave you what I thought was my understanding of what the S'Klallamish believe and what the Squamish believe. Where did the column fall on that, in that argument? I would assume that they believe that hunting extends beyond the ceded areas, potentially statewide. So they potentially believe the same as the Squamish? Yes. So they have a different view from you? Potentially, yes. Okay. But they are not represented in this case, but would they be bound by that if we decided that question in your case? You've just argued that we're bound by the Washington Supreme Court. This Court is bound by the principles established in Winants, which say the treaties are a reservation of rights. Right. Again, you're dealing a very high level of abstraction. I'm trying to figure out what has been decided and what hasn't been decided about hunting grounds and the treaty interpretation. Within a ceded area, there is lands that were conveyed. Under Winants, we reserved equitable servitudes to access those lands. That's settled. We feel that within a ceded area, you have the ability to exclude others that don't belong to that ceded area. Here's the problem, Counselor. You've tried to pick off the Squamish here. You've taken what looks like sort of a big rumble and made it into a tennis bracket, which you're going to pick one off at a time. And if we were to decide the question between you and the Squamish, it surely would have collateral consequences for the column and perhaps for other tribes that aren't represented at table here today. And they're not in that case. So there are important collateral consequences to other tribes. That's what was recognized in Goldmark, what Judge Layton recognized here. Even if this Court believes that those other parties are necessary, we make the argument under Rule 19b that in equity and fairness we'd be able to proceed forward. The basis for that is the alternative is truly draconian. I mean, we are then faced with really two options. One, promulgating a regulation to open an area that is truly absurd, sending a tribal member there so that they are arrested and federally prosecuted. The alternative is to use our special law enforcement commissions issued by the federal government and arrest a Squamish member within the area and then allow a civil rights action to proceed forward through this Court. You have no other way of going to the United States and asking them to convene some kind of a proceeding here? They have declined our request. We have made multiple requests over the years. The problem they have is they believe that they have conflicting interests between their trustee, their clients, and that they have just stepped back. It's not like in U.S. v. Washington where we were aligned all on one issue. Okay. I'm sorry, go ahead. I was going to say we're here if we're out of the declaratory judgment action. We're now just in the injunction action, and you've amended to just have an injunction. Why is it that this is a necessary thing for this Court to take on or any Court to take on when you suggest all you've got to do is tear up the paper that gave Minnie Wright it all? I guess I'm not sure what you mean, Your Honor. Literally go with the S'Klallams, for example? Right. We would likely then be back into the same. The concern that we have is that once we tear up the paper with the S'Klallams, then we may have another neighbor who comes forward and says, like, Quinault or the Squaxin. Then we have to tear up another piece of paper. We don't want to create a political controversy or discord among tribes when we're really only trying to stop the actions of the Suquamish officers who are opening the west side of Hood Canal well within our territory. All I was trying to do is say, why would you have to go with an injunction if you can just revoke the agreements you've entered into? I'm trying to get to that. I want to get that in the record because that, to me, seems pretty important before I give an injunction. So even if we were to revoke everyone else's permission and say, within this area we're closing it to everyone else and then name them all, we contemplated that possibility, but we felt that in equity under Rule 19b, that this would be the better alternative, only going after that one bad actor. If you have a water rights case and you have senior water rights here all the way down through 20 people with junior water rights, why do you have to sue every single one to get to that one bad actor in the middle? Because you cause so much more harm. Well, certainly you're going to do that if, in fact, what you're going to do in that lawsuit is create law, which every one of them will then be responsible to live by. You're going to decide a question against the Squamish that's going to apply to everybody else. If we come in and say we've looked at the legal question and it's between the Squamish and the Squamish, the Squamish win, and this is the proper interpretation of the treaty, that is going to be binding on a subsequent panel of the court with regard to the next tribe who never had the opportunity of challenging that. Their only option would be to come in and seek en banc review or cert review. So if this court were so inclined to remand this back to the district court, we would consider amending our complaint to permit, in essence, revoking the permission of all of the other tribes that potentially could access our area and name them. There has to be some limitation on that. And you would name them? By revoking, you would then name them as what? I guess we would. And where's the waiver of sovereign immunity? There wouldn't be a waiver. We would have to go after their officers because some of them are promulgated regulations within what we perceive as our territory. You'd feel factually in seeking your injunction in that case, wouldn't you, because they've done nothing. For example, the Sklallams have opened areas south of the 104 Bridge, which is within our territory. Well, put all of them. I mean, you said you'd name all of them, and you don't have facts to support injunctive relief, do you, with the others? We have evidence that suggests that they've been, in fact, opening those areas and taking gain. Several of those tribes. And you think you can get all of them under Ex parte Young? The problem is we wouldn't be able to, for example, get Nez Perce because we have no indication that they've opened up the Olympic Mountains. They're far removed from that area. There has to be some limitation on the number of parties we would have to join. Even when U.S. v. Washington was brought, it was not brought by all of the treaty tribes, only a handful of them, Skokomish being one of them. Other tribes came later. If we were to — let's suppose that you brought such a suit, how would — and it was all based on Ex parte Young. How do you get around the Coeur d'Alene case and our cases that have followed this and said, look, this is effectively a quiet title action? It's not exactly, it's not precisely quiet title because we're not really talking about the title to land. You're not going to change title from the United States or the state of Washington to the tribes. But it's really important that it really — these are rights that run with the land. And I think that we can distinguish the Coeur d'Alene case because in Coeur d'Alene they truly were seeking the quiet title or finding ownership of that submerged land. With respect to what we're doing, we feel that the court is — and our reservation of rights, our equitable servitudes are already established within that seated area. Beyond that area, we're not asking to exclude anyone. In principle, that's not a whole lot different than what the parties in a quiet title action would be doing. I mean, in principle. I know it's not quieting the title, but it's the same principle. But in Fond du Lac Band of Chippewa Indians, the state had argued that the relief slot encroaches upon the core sovereign function of the state, namely fish and game regulations. And what we're really looking at are the regulations. The regulations being the — that are being implemented by those officers. And so we're not looking to say that this is within our boundaries. We're looking to say that you can't issue that license. It's more of a regulatory act. I would just distinguish it on Fond du Lac. Counsel, we've taken you well over your time, and I appreciate you sticking with us. I will afford you a couple of minutes for rebuttal. Thank you, Your Honors. Good morning, Your Honors. John Ogin for the Suquamish Tribe, as well as the individually named tribal officials of the Suquamish Tribe. May it please the Court. I appreciate the argument of counsel before and the questions of the Court. Let's review what the district court has said. In the case below, Suquamish argued that it need not join any other tribe because this is all settled law. The rights to hunt in these open and unclaimed lands, wherever those may be, and they have not been adjudicated back to that point, the rights vis-a-vis among the treaty tribes has been well settled, established law. That's the assertion. Judge Layton put his finger right on that in his opinion with respect to the failure to join indispensable parties and said their case lives or dies based on the truth of that assertion, that it's well settled law. Judge Layton looked at the U.S. versus Washington cases, primarily what's called the Hood Canal primary rights case. I think that's 626 FSUP 1405. That's the case that Suquamish points to as where it was adjudicated that it has the primary rights over this vast Tijuana territory for not only fishing and hunting. That's the case it cites to here and has previously in Goldmark as well. Judge Layton looked at it and said, this is not settled law. Because it wasn't settled law, as the question suggests this morning, Judge Layton understood that any adjudication that the Suquamish tribe had primary rights vis-a-vis Suquamish on open and unclaimed lands necessarily affected every other Stevens Treaty tribe. For purposes of my question, assume that I agree with your premises so far. Okay? It looks to me like, you know, you're headed for problems here. You're headed for head-on conflicts that may result, you know, heaven forbid, that would result in violence. But there's just going to be a headlong problem here. How do you solve the problem of trying to decide this question? Help us figure out some solutions. Mr. Lees was suggesting a couple of things. I think they had a lot of problems with them. I'm not sure I have a better solution. Do you have a better solution? I do, as did Judge Layton. Suquamish argues that its primary rights to hunt on this open unclaimed land that it calls Tijuana territory was established in the United States v. Washington case in 1984. United States v. Washington is a continuing jurisdiction case with a permanent injunction. Paragraph 25A1 of the continuing and permanent injunction allows any party to come before that court to enforce any of that court's orders or judgments. It happens all the time, Your Honors. And do you agree that that court would have jurisdiction over the hunting rights? That court would have jurisdiction. But you just told us that that case dealt with fishing rights. It does deal with fishing rights. Suquamish's argument, if they're to be held to their own position, is that that is where their rights were established. Okay, well, that suggests that you believe that they should have, if their theory is correct, that they should have gone to U.S. v. Washington. I suspect that you would have opposed that. We would have appeared and participated in the case and argued in opposition that the rights that they claimed to the primary hunting rights they seek to have enforced under paragraph 25A1 have never been established. And then the court would kick you out and be right back where we are right now. So how do you solve the problem? Who can get jurisdiction over everybody that we need to have jurisdiction over in order to decide this question? I believe unless and until the tribes who this action would operate against waive their sovereign immunity, that there is not a judicial solution. And as the courts have said before, not every problem has a solution to be found in federal court through adjudication. It's an aside, but I think my client, the Suquamish tribe, believes that it, along with the other treaty tribes, ought to be working together and talking as sovereigns, as co-managers of this resource, on how to sort through these things. But back to the legal issues, we can't speak to the policy so much here this morning, but the legal issues, and you're directly on it. What is, there are 20-some on, forgive me for not knowing the exact answer, Stevens Treaty tribes that have nearly identical language, and that is a reservation of rights to hunt on open and unclaimed lands. There has been no federal determination as to what constitutes open and unclaimed lands generally or open and unclaimed lands as referred to in any one of those numerous specific treaties. Before you get too far, Your Honor, your answer to Judge Bybee's question is that you don't have any solutions, right? That's correct, Your Honor. Okay. Litigation solutions. You not only would have to address the question of what are open and unclaimed lands, but I suspect that as much as we would not like to address this in the 21st century, that we'd probably have to confront the difference between a right and a privilege, since those words are used, there's a right to fish and only a privilege to hunt. There is some fishing case law direction, but yes, whether or not that would transfer from the fishing context for usual and accustomed areas, which is different than traditional hunting grounds, that would certainly have to be adjudicated. Squamish was discussing a state of Washington case with you that does not control here. Somewhat shocking to counsel seated with me along with the counsel for two of the Squallam, two other tribes from the point-no-point treaty, will address the court right after me. We'd also have to address where did the Squamish predecessors travel to hunt and gather their foods and fish? Where did Squamish? Where did Jamestown Squallam? Where did Port Gamble Squallam? All of those issues. The case that was discussed with you is called Buchanan from Washington Supreme Court. It makes it a fact-bound, specific inquiry as to whether or not there is evidence as to where these native peoples moved, who they interacted with, how frequent did they go. So Buchanan really just says, beyond open and unclaimed, who has what rights on open and claimed land is a fact-bound inquiry. Your Honor's right. This is probably decades of litigation if we're going to go down this road where one tribe comes in, names a group of tribal officials from Squamish like it has, and just declares that the 1905 Winans case has resolved all of this for us. I want the court, if it hasn't already looked, at what Judge Martinez. Squamish is arguing that U.S. v. Washington has established these primary rights in it vis-à-vis all the other tribes. Just this last August, in sub-proceeding 1701, Judge Squamish had brought another case arguing that it had expansive primary fishing rights beyond Hood Canal. So Judge Layton had to go look at U.S. v. Washington. Judge Robart before him in the Goldmark case had to go look at U.S. v. Washington. Well, now we hear from U.S. v. Washington just this last August. And Judge Martinez in 1701 said the 1984 case that was relied upon in Goldmark, in this case, and in 1701, it did not establish broad primary rights in the Squamish tribe over natural resources in Tawana Territory. It specifically and only established primary fishing rights in the water body known as Hood Canal. Your Honor, we submit that case was decided, and Judge Martinez clarified with absolute certainty what was and was not settled in the 1984 primary rights case. When that opinion was released, we submit Squamish should have withdrawn this appeal. It did not. It did appeal. That case is up on appeal before this Court. That is appealed, right? That is appealed. That is appealed. And we expect, well, we'll see what the panel does with it, but I think Judge Martinez, the presiding judge for many years in that case, knows what the 1984 case stands for. Has that case been argued? No, it has not been argued. Okay. Has it been noticed? Do you have a date for argument? Okay. You have briefed it? Yes. So, Your Honors. Just as a matter of housekeeping, are you ceding time to? I am, and I was going to see if you would like to pursue this. Well, how many minutes were you planning on ceding to counsel? You have five minutes and 53, 52, 51 seconds. I'd like to give counsel for the Jamestown and Port Gamble-Sclallam tribes four minutes, so I'll wrap up. Are there more questions along this line before I launch into something? With respect to perhaps we started the inquiry about is there a solution here, the failure to leave to amend the complaint was correctly decided by the district court because it's futile. This action fundamentally acts against the sovereign, just as the Coeur d'Alene and Idaho case did. In that case, the Coeur d'Alene tribe sought relief to dispossess the state of its use and regulatory jurisdiction over certain interests and land. That's what's happening here. This is fundamentally a case. Both the Kennedy portion and the O'Connor portion said, the ex parte young fiction does not apply. You can't go up and just scoop up a bunch of tribal officials performing their governmental responsibilities, trying to circumvent the significant fundamental state interest in its use and regulatory authority over property interests. The Coeur d'Alene case is fantastic authority, and thank the court for its reference to the parties, for supporting and affirming the district court's decision that leave to amend would be futile and was therefore denied. I'm going to cede time to counsel. Thank you. May it please the court. My name is Lauren Rasmussen for the Port Gamble S'Klallam and Jamestown S'Klallam tribes. This is the third case we've had to participate in to defend the Treaty of Point-No-Point, which we signed with the Skokomish tribe, in which in Article I it recognized that the S'Klallam shared and occupied the treaty territory together with Skokomish. Absent from the treaty is any language about a primary or superior right over the S'Klallam. Absent from the treaty is any language of ability to exclude each other from the treaty territory. I believe this case is a collateral attack on the S'Klallam's ability. You've heard the Skokomish tribe. Next time we're going to join you is what they said to the court as a proposal for amendment. We're going to revoke your invitation. I want to make sure that I'm absolutely clear. So is it the S'Klallam's position that they are an indispensable party and that they refuse to waive their sovereign immunity in this case? It is absolutely the S'Klallam's position. They are an indispensable and necessary party needed for adjudication. The Goldmark Court already recognized that the S'Klallam were necessary to this adjudication. The Skokomish ignored that admonition from the Goldmark Court, telling them that they needed to join the S'Klallam next time they wanted to and that this new fictitious theory that they're going to somehow exclude the primary right and proceed forward with this case is just a bunch of a shell game. In all of these cases, what they're seeking to do is deprive all the other tribes of their due process right to challenge the Skokomish's interpretation of two things. One, the open and unclaimed land language of the treaty. The S'Klallam absolutely do not concur with Skokomish's assertion that Buchanan governed. The S'Klallam believe that open and unclaimed lands is an area beyond the ceded territory, that we can open these areas that the S'Klallam were acting legally when they issued the regulations and that they did nothing wrong. In addition, the Skokomish stipulated to the S'Klallam that the primary right they were seeking in U.S. v. Washington was merely a right to regulate and control fishing in the Wadi of Water and Hood Canal. This agreement cannot be torn up because it's now a court order in that case. So regardless of what the Skokomish says now, that we can throw all this out and exclude the S'Klallam, that agreement says we stipulate that we will never exercise or seek to exercise the primary right against the S'Klallam without their consent under any condition or for any reason whatsoever. And nevertheless, we've had to run to three courts reminding the Skokomish of their promises to us and telling the courts they can't expand the primary right. They have a bundle of sticks. The bundle of sticks applies only to the usual and accustomed fishing grounds and stations clause of the treaty. That is all they have in terms of a primary right adjudication. And in fact, they mislead the court and they tell the court on page 3 of their reply brief that finding of fact 353 describes this broad territory, and they say that that means their primary right expands to that broad territory. The court did not adopt finding of fact 353 as the territory of the Skokomish tribe. The court in conclusion of law 92 found at 626 FSUP at 1491 states we adopt finding of fact 354, and 354 specifically says that the territory is the water body of Hood Canal. So they're not only misleading one court, but they're misleading several courts in this assertion that finding of fact 353 is the one that governs their territory. So we're starting with a fiction, and then they're telling the Skokomish Tribal Council, you're violating the law by issuing these regulations. But they're incorrect for two reasons. The only prohibition on Skokomish's behavior is to not open fishing in Hood Canal. So how should the Skokomish tribe know that they're supposed to take a finding of fact the court never adopted, apply it to hunting, and then also overrule the open and unclaimed language in the treaty? All of these things would have to happen for the Skokomish's theory of the case, which has now completely changed from the district court to be valid. And so to go back to this court's assertion that we should consider shermone, I would say that I would think that amendment would be completely futile because what the Skokomish proposed to amend it to the district court, what Skokomish proposed was to join the Sklallam as parties and that that would solve their problem. Well, they've already been told by the Goldmark case, if you're going to claim exclusivity, if you're going to define the open and unclaimed lands of the point-no-point treaty and what that means, you had better come back here with the Sklallam tribes. Otherwise, they're an indispensable necessary party. There's no public rights exception here. And we will not join them. And in this case, they cannot be joined for two reasons. One, because they still can't fix their problem of other tribes. But two, because the actions they're asserting are not illegal. And in order for them to determine the actions are illegal, they need some court, like they did in U.S. v. Washington. Let's remember, these are cases where the Skokomish had asked the court for a determination that the primary right applied to fishing. They're not doing that here. They're skipping a step. So is there any solution to this problem? Well, so as the court recognizes at the end of Idaho v. Coeur d'Alene, when you're dealing with the relationship between tribal sovereigns, only Congress can resolve this. There's no judicial restraint must be exercised. And that is the last line of Idaho v. Coeur d'Alene that says, look, sometimes there's not a solution here. But the problem derives from this expansive reading of Skokomish's about the bundle of sticks that they got with the treaty. The bundle of sticks, the primary right that is not contained in the language of the treaty. So if it's not contained in the language of the treaty, they need some court to adopt their interpretation that the primary right to control a fishing water body should necessarily apply to a much broader territory. And in order to establish primary rights in U.S. v. Washington, they had to show exclusive claim of occupancy, that they excluded all others at treaty times. And this is in the U.S. v. Skokomish case and the Elwha case. Tribes had to prove with anthropological evidence that they excluded all others. The Skokomish can't do this because the territory they're claiming was jointly occupied per Article I of the treaty with the S'Klallam. So even if they were to amend their complaint, they can't solve the problem that the hunting right was to open in unclaimed lands, not to use in the custom fishing grounds and stations. And so as a result, the claim cannot be fixed. Buchanan does not apply here. The treaty interpretation has never happened that their saying applies, and it is the Skokomish that are barred by res judicata from arguing fictitious things like finding a fact 354 governs that they can somehow amend the complaint by not joining necessary parties. It's the Skokomish that need to follow the law, not the members of the Skokomish Tribal Council. Thank you, Your Honor.  Let's put two minutes on the clock for Mr. Lees. Thank you, Your Honors. I think that to get to the heart of this, Ms. Rasmussen talks about the Hood Canal Agreement and our four-day trial against the S'Klomish. She acknowledges that we had to prove exclusive use and occupancy of Hood Canal, and that is the area contested here. They opened, their officers, Hood Canal. Even in the Hood Canal Agreement that the S'Klallams wave in our face, they stipulated and agreed that Hood Canal was Tawana's territory, our territory, and that we had legitimate territorial control over that at treaty time. That is the settlement that we held. You're talking about settlement of fishing rights? Settlement of, they would say, it appears that they blend them together. But, yes, it was settlement of fishing rights over Hood Canal. Okay, but the canal is different from the forest. Well, in our case, we actually had in the four-day trial have to argue hunting within that area. The court had to make specific findings with respect to our water fouling, had to make specific findings with respect to our use of guardian spirits to take certain marine mammals. But within that area, they have opened Hood Canal. So if they stand on a tideland in Hood Canal where we fish, they are saying that we can exclude them from fishing, but we can't exclude them from shooting a bird. And so we find that entirely to be a violation of that reservation of rights. There is no dispute that Hood Canal and the waterways in it are Tawana's and S'Klallam's property. And we also disagree with how they characterized the 1984 decision in our recent appeal. We believe that Judge Martinez erred and didn't have all the facts because the state, as well as the Squaxin tribe, intentionally withheld information that was pertinent to the mediation. And we've recently disclosed that. But, again, we feel that you can take from different cases and apply those. And so even in Winans, as we've argued, that principle that the treaty was a reservation of rights that granted equitable servitudes has been applied in many other contexts. All we're asking is for the opportunity to take those findings that have been fully litigated and rely upon them to show our theory. We, again, have not completely changed our theory. We said within Hood Canal, which is a component of our territory, we reserve rights. The S'Klallam, they were up north. They have a primary right over S'Klallam country up in Klallam County near the Straits of Juan de Fuca. And the Suquamish, they don't have any claim at all. It wasn't their ceded area. That is what Article I says. And Article I of the Point Elliot Treaty says something entirely different. Thank you. Thank you. We thank all counsel for the argument in the case. It has been helpful, and it's a very vexing case. And with that, the Court is adjourned for the day. All rise.
judges: Bybee, N.R. Smith, Antoon